CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

02/27/2020

JULIA C. DUDLEY, CLERK
BY: H. Woods
DEPUTY CLERK

## UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

| | |
|---|---|
| "Baby L." a minor, by and through her legal guardians and next friends, DOE 1, and DOE 2, DOE 1, individually and as next friend of "Baby L." and DOE 2, individually and as next friend of "Baby L." <br><br> *Plaintiffs*, <br><br> v. <br><br> Dr. MARK ESPER, in his official capacity as Secretary for the United States Department of Defense; MICHAEL POMPEO, in his official capacity as Secretary for the United States Department of State, DONNA WELTON, in her official capacity as Assistant Chief of Mission, United States Embassy Kabul (USEK), DOE DEFENDANTS 1-20, in their official capacities, | Civil Action No. 3:20CV00009 |

## MEMO IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER

This matter is before the Court on plaintiff DOE 1 and DOE 2's Verified Complaint and Petition for a Temporary Restraining Order. [Doc. 1]. Plaintiffs Motion requests the Court to immediately issue a temporary restraining order requiring the Plaintiffs' informed written consent prior to Defendants taking any action that would materially impact the health, safety, or welfare of minor child Baby L.

## I.    Background

This litigation relates to the attempted transfer out of U.S custody of minor child Baby L., at the behest of Department of State ("DoS") actors, to an anonymous, un-vetted person with likely ██████ affiliations with the ██████████████ ("██ in an active ███ zone, in winter, without Plaintiffs knowledge or consent, and contrary to the objective best interests of Plaintiff DOE 1 and DOE 2's legal ward, Baby L. ("the Child"). [See Doc. 1]. The Child had previously sustained a ██████████ and ████████████, █████████████████████████████, ████████████████, and a ███████████████████ during a U.S. combat operation against ████████████ leaders of the ████ [Id.]. A temporary restraining order is necessary to prevent DoS from irreparably harming the Child's best interests and the interests of Doe 1 and Doe 2

## II. Standard of Review

A temporary restraining order is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def Council,* 555 U.S. 7, 22 (2008); *see also Direx Israel Ltd. Breakthrough Med. Corp.,* 952 F.2d 802, 811 (4th Cir.1992). A movant seeking a temporary restraining order must establish that (1) the movant is likely to succeed on the merits; (2) the movant is likely to be irreparably harmed absent preliminary relief; (3) the balance of equities tips in movant's favor; and (4) an injunction is in the public interest. *See The Real Truth About Obama v. FEC,* 575 F.3d 342, 345–47 (4th Cir.2009) (quoting *Winter,* 555 U.S. at 20), *vacated by* 130 S.Ct 2371 (2010), *reinstated in part by* 607 F.3d 356 (4th Cir.2010). The United States Court of Appeals for the Fourth Circuit emphasized that this standard is more stringent than its previous standard and that plaintiffs must clearly show that they are likely to succeed on the merits before such extraordinary relief is awarded. *See id.* This stringent standard is easily met here.

On the basis of the unjustifiable actions of the Defendants, wholly without regard to the Best Interests of the Child, or the legal custodial rights vested in DOE 1 and DOE 2, of which Defendant Donna Welton and others at DoS have long been aware, Plaintiffs are entitled to a temporary restraining order and a preliminary injunction, because they are (1) "likely to succeed on the merits," (2) "likely to suffer irreparable harm in the absence of preliminary relief," (3) the "balance of equities" tip in their favor, and (4) granting Plaintiffs preliminary relief is in the "public interest." *Winter* at 374.

Here, each of the four *Winter* factors weigh in favor of Plaintiffs' request for a temporary restraining order. The court may issue a temporary restraining order without notice to the opposing party if "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition," and "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b).

Rule 65(c) of the Federal Rules of Civil Procedure also provides that a TRO may be issued "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Fourth Circuit has stated that while the district court has discretion to set the bond amount "in such sum as the court deems proper," it is not free to disregard the bond requirement altogether. *Hoechst Diafoil Co. v. Nan Ya Plastics Corp*., 174 F.3d 411, 421 (4th Cir. 1999). The Fourth Circuit has also found that a court has no mandatory duty to impose a bond as a condition for issuance of injunctive relief. "Where the district court determines that the risk of harm is remote, or that the circumstances otherwise warrant it, the court may fix the amount of the bond accordingly. In some circumstances, a nominal bond may suffice. *See,*

*e.g., International Controls Corp. v. Vesco,* 490 F.2d 1334 (2d Cir.1974) (approving district court's fixing bond amount at zero in the absence of evidence regarding likelihood of harm)." *Id.* Thus, if the Court finds injunctive relief appropriate, the Court must address whether a bond is needed, but it need not require one.

**III. Analysis**

Plaintiff's verified complaint arises under the Fifth and Fourteenth Amendments to the U.S. Constitution. The Fifth Amendment forbids the Government from depriving a U.S. citizen from "life, liberty, or property, without due process of law," U.S. Const., Amdt. 5. *See Mathews v. Eldridge,* 424 U.S. 319 (1976). See, *e.g., Heller v. Doe,* 509 U.S. 312, 330–331 (1993); *Zinermon v. Burch,* 494 U.S. 113, 127–128 (1990); *United States v. Salerno,* 481 U.S. 739, 746 (1987); *Schall v. Martin,* 467 U.S. 253, 274–275 (1984). Matters touching the family have traditionally been areas reserved to the states.

The Supreme Court has "long recognized that the [Fourteenth] Amendment's Due Process Clause, like its Fifth Amendment counterpart, "guarantees more than fair process." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (internal citations omitted). The Clause also includes a substantive component that "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg,* 521 U.S. 702, 720 (1997); see also *Reno v. Flores,* 507 U.S. 292, 301–302 (1993) (government may not infringe certain "fundamental" liberty interests *at all,* no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest."). Here, DOE 1 and DOE 2 have not only not received "fair process;" they have received "no" process by DoS █████ government actors, who have treated DOE 1's legal guardianship over Baby L., and her status as his █████████ and all of the rights and privileges pertaining thereto as a nullity.

DoS/███ may not *like* DOE 1's guardianship status, but it cannot ignore it. A ███ court found jurisdiction over Baby L. under the ███ statutory adoption of the UCCJEA, and appointed DOE 1 and DOE 2 her legal guardians so they could pursue the Best Interest of the Child in her unique and tragic circumstances. In light of this status, DOE 1 and DOE 2 enjoy a fundamental liberty interest under the Fifth and Fourteenth Amendments in protecting their minor ward and ensuring that all actions taken affecting her maintain a "Best Interests of the Child" focus, a principle of law that is consistent with fundamental human rights.

For the reasons stated below, the Court should find that Plaintiffs have established each of the four prongs for substantively granting a TRO. The Court should find that Plaintiffs have satisfied all of the procedural requirements of granting a TRO, pursuant to Federal Rule of Civil Procedure 65, including establishing why it is necessary to grant this injunction without notice to defendant and why bond should not be required. In making these determinations, the Court is not ruling that any future DNA-related and non-███ affiliated relatives are cut off from pursuing child custody. Instead, the Court is simply concluding that Plaintiffs have satisfied the requirements for granting a TRO that preserves the status quo pending a hearing on Plaintiff's petition. *See Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70,* 415 U.S. 423, 439 (1974) (granting a TRO simply preserves the status quo and is not a determination on the merits).

## A. Likelihood of Success on the Merits

The first prong of the TRO analysis requires Plaintiffs to demonstrate that their claims have a likelihood of success on the merits. *Winter*, 555 U.S. at 20. Here, the facts in the Plaintiffs' verified complaint demonstrate that they will likely succeed in establishing that the minor Child is their legal ward; that she has been recognized by the ███

███████ that she has been issued a ████████████████████████ that she has been issued a ██████ Record of Foreign Birth; that she is a Patient in the DoD's Military Health System; that she is eligible for, and has been registered in the ████████████████ program; that the DOEs have secured a qualified pediatrician for Baby L. at the University of ██████ Children's Hospital; that a treatment plan to address her medical needs has been created; and that the DoD has requested a humanitarian parole visa for her to enter the United States to receive treatment at ██████ Children's Hospital. *See Stinnie v. Holcomb*, 355 F. Supp. 3d 514, 527 (W.D. Va. 2018) ("[A]ll that is necessary for preliminary injunctive relief is establishing the likelihood of success on at least one of their claims.")

### 1. Legal Guardians have a Liberty Interest in Securing the Safety, Health, and Welfare of their Legal Wards.

Legal guardians of children have a liberty interest in securing the safety, health, and welfare of their minor wards which cannot be violated without due process of law. *Pierce v. Society of Sisters*, 268 U.S. 510, 534-535 (1925) (the "liberty of parents **and guardians**" includes the right "to direct the upbringing and education of children under their control."). "The liberty interest … in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized" by the United States Supreme Court. *Troxel v. Granville*, 530 U.S. 57, 65 (2000), (citing and discussing, inter alia, *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997); *Parham v. J.R.*, 442 U.S. 584, 602 (1979); *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Prince v. Massachusetts*, 321 U.S. 158 (1944); *Pierce v. Society of Sisters*, 268 U.S. 510, 534–5 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 400 (1923)). "In light of this extensive precedent, it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents [or those acting as

a parent] to make decisions concerning the care, custody, and control of their children." *Troxel*, 530 U.S. at 66, 120 S.Ct. 2054.

### 2. The Plaintiffs are the Lawful Permanent Guardians of Baby L. Under ▮▮▮▮ Law.

The Plaintiff's are the lawful permanent legal guardians of Baby L. pursuant to ▮▮▮▮ adoption of the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA). Under the ▮▮▮▮ UCCJEA, the Juvenile and Domestic Relations Court of the Plaintiff DOEs' County of residence found by a preponderance of the evidence, while DOE 1 was present with the child in ▮▮▮▮ that Baby L. was born in an unknown jurisdiction; that she was an orphaned child of a foreign fighter family, not native of ▮▮▮▮ that the foreign fighter family groups she was a part of are transient terrorist groups which move for tactical reasons every thirty days; that Baby L. was a stateless minor in the custody of the United States; and that jurisdiction was proper under section ▮▮▮▮ of the ▮▮▮▮ (Doc. 1, Exhibit C and D).

This exercise of jurisdiction was found to be proper by the ▮▮▮▮ court as, among other factors, no home state (or country pursuant to § ▮▮▮▮) had been established wherein Baby L. had continuously and consecutively resided with her parents from birth until the commencement of the custody proceedings; that Plaintiff DOE 1 has acted as "parent" for the long-term welfare of the Child within ▮▮▮▮ and has spent every effort to secure health care, legal jurisdiction, benefits, and safety for her; that the Plaintiff's had substantial ties to the relevant jurisdiction in ▮▮▮▮ and that sufficient evidence was available to the court to grant legal custody in ▮▮▮▮ (Doc. 1, Exhibit C and D).

### 3. The Government has Otherwise Acted in Conformity with the Plaintiff's Rights

In contrast to the Defendant's conduct, both the Federal Government and ████████ ████████ have taken significant steps to recognize Plaintiff's legal guardianship of Baby L., and the rights, privileges, and protections pertaining thereto.

Specifically, the ████████████ recognized the Plaintiff's role in acting in the Best Interests of the Child by granting DOE 1 and DOE 2 permanent legal custody over Baby L. In recognition of the Child's need for a legal identity, including a date of birth and legal name, the ████████ of ████ recognized Baby L.'s right to a ████ Certificate of Foreign Birth. (Doc. 1, Exhibits C, D, and E).

The Federal Government has also recognized the Plaintiff's rights by approving the Child as a ████████████ ████ based on the ████ Court Order, through the ████ of the ████████ ████ (Doc. 1, Exhibit F). The DoD has issued a ████████████ letter indicating Baby L. is the ████████ 1, and that she is ████████████ ████████ (Doc. 1, Exhibit F and L, pages 9 and 10).

Currently, Dr. ████ ████ M.D., of the University of ████ Children's Hospital is Baby L.'s ████████ (████ and has prepared a treatment plan to address the Child's medical needs. (Doc. 1, Exhibits H, I, and J). Baby L. is currently scheduled for an initial screening appointment with Dr. ████ on 27 February 2019. (Doc. 1, Exhibit L).

In addition, Baby L. has been issued a ████████████ to facilitate her travel on military aircraft, and demonstrate her ████████ like health care, space available military air flights, and medical evacuation. (Doc. 1, Exhibit B). Under the ████████████ with ████ eligible persons such as ██

█████████ do not require notice or permission (visa) from the host nation to enter or exit the country on military aircraft as per the █████████████████████ █████████ (Doc. 1, Exhibit X).

As per DOE 1's request to United States Transportation Command (TRANSCOM) through the █████████████████████████████████████ Baby L. is eligible for medical evacuation on a military aircraft from █████████ to the United States based on her status as a stateless minor who is a █████████ (Doc. 1, Exhibit M, page 2).

The DoD initiated an "Agency Requested" humanitarian parole visa for Baby L. on 11 February 2019 due to her; 1) status as a █████████ 2) status as a patient in the DoD's Military Health System for 160+ days, and; 3) her need for medical care to correct injuries sustained as collateral damage to a U.S. combat operation in the Global War on Terror. This request was approved and forwarded to the U.S. Citizenship and Immigration Service for approval of a humanitarian parole visa at the Assistant Deputy Secretary of Defense Level.

Ultimately, Baby L.'s 160+ day stay as a patient at the █████████████ is de facto acknowledgement by the U.S. government that █████████ does not have the ability to care for the Child, and they have declined to take custody of Baby L. on more than one occasion; one of which was in the Plaintiff DOE 1 and █████████ 's presence. Of note, Baby L. has no legal identity beyond the court ordered identity requested for her by the DOEs, and is not recognized as the citizen of any country.

**4. Plaintiff Minor Child's Right to Equal Protection has been and is being violated by the Defendants failing to Recognize her Due Process Rights.**

    **a. Contrasted with treatment of Haitian Minors**

The actions of ████████████ and other Doe defendants at US Embassy ████ (████

toward Baby L. in seeking to turn her over to un-vetted third party claimants that are likely ██

████ affiliated members of the ████████████ are wholly inconsistent with past

government treatment of unaccompanied minors in the custody of the U.S. military aboard foreign

bases.

For example, toward the end of the mass migration Haitian refugee crisis in the early 1990s,

the "only Haitians then remaining on Guantanamo were some 350 unaccompanied minors."

Unaccompanied minors are "the most vulnerable of refugees, who must be treated in accordance

with refugee law and the rights of the child." Despite their numbers (more than 300 children), "**the**

**government conducted an individualized 'best interests' type of inquiry for each**

**unaccompanied minor**." (emphasis added). "[T]he United States did not return them to Haiti

without a 'best interests of the child' assessment that **included family tracing**." (emphasis added).

*See* Kate Jastram, *The Kids Before Khadr: Haitian Refugee Children on Guantanamo A Comment*

*on Richard J. Wilson's Omar Khadr: Domestic and International Litigation Strategies for A Child*

*in Armed Conflict Held at Guantanamo*, 11 Santa Clara J. Int'l L. 81, 91, 98 (2012).

At a minimum, Baby L.'s fundamental Due Process and Equal Protection rights will be

violated without a full "Best Interests of the Child" inquiry, which must include "family tracing"

by a modern method designed to provide assurance that the claims of any third parties are true

commensurate with the documented dangers to children in ████████ i.e., by DNA vetting.

Furthermore, a Best Interests of the Child analysis derived from all U.S. intelligence information,

assets and technologies which are readily available to the Government, is necessary to determine

if any DNA confirmed relatives are ████████████ affiliated.

The Haitian minors received this due process even in the absence of U.S. citizen legal guardians who had established a pathway to the U.S. for their medical care. In this case, Baby L. is the beneficiary of a U.S. jurisdiction's legal custody order, by means of which the custodian has arranged for specialized medical treatment in the U.S. at no charge, and which permits a minor child in Baby L.'s condition to correct treatable ███████. In contrast to the Haitian minors, which did not suffer significant injuries as collateral damage to U.S. military combat operations, Baby L. has suffered significant, █████████ as a direct result of a U.S. Special Forces assault on an ███████ terrorist facility. Thus, the U.S. owes a higher standard of care to Baby L. under these circumstances than that owed to Haitian minors who had merely fallen into the custody of the U.S. government as a result of illegal mass migration.

### b. Contrasted Treatment of Adult Terrorists

Baby L., an innocent little girl ████████████ in a U.S. combat operation and in custody of ██████████████ for more than 160 days has had no independent, agency-designated advocate appointed on her behalf to provide oversight and advocacy on whether actions proposed by DoS/██████ or DoD/████████ are in the Child's best interests. This contrasts starkly with the great pains DoD and others took to provide adult terrorist detainees aboard ██████ with due process rights: the "*Al Maqaleh* detainees' status was reviewed by the Unlawful Enemy Combatant Review Board (UECRB)." *Ali v. Rumsfeld*, 649 F.3d 762, 772 (D.C. Cir. 2011). The *Boumediene* detainees' benefited from a Combatant Status Review Tribunal (CSRT) that reviewed the *Boumediene* detainees' status. *Al Maqaleh v. Gates*, 605 F.3d 84, 96 (D.C.Cir.2010).

Here, beyond provision of stabilizing medical care and extraordinary efforts by ████████ ██████ medical personnel on her behalf, there has been zero official, independent, advocacy for Baby L.'s best interests. In fact, upon ██████ complaint regarding the Plaintiff's advocacy in his

Case 3:20-cv-00009-NKM Document 29 SEALED Filed 07/09/20 Page 12 of 27 Pageid#: 696
263

personal capacity on behalf of his court-ordered legal ward and ███████ General ████

placed a gag order on all ██████ personnel, and communicated that "**no one was to advocate
on her behalf**."

In fact, DOE 1's concerns about Defendant Welton and ██████ disposition toward the
Child motivated DOE 1, due to his situation and skillset, to seek guardianship over the Child so he
could advocate on her behalf if needed. But for DOE 1 seeking a legal basis to advocate for the
Child, Baby L. would already have been placed outside of U.S. protection in an extremely
dangerous environment in October 2019. In fact, the Plaintiff's advocacy efforts on Baby L.'s
behalf were recognized by the ██████ court in its award of sole legal custody of Baby L. to DOE
1 and DOE 2.

DOE 1's advocacy efforts on Baby L.'s behalf and the recognition he has obtained thus
far have created a legal identify for her and have been the sole impediment to DoS' repeated
attempts to dispose of her without even the most basic of analyses as to her best interests. DoS
cannot create a "legal black hole" at ████████ for minor children who are ████████
and legal wards of U.S. citizens where Due Process does not apply. If adult ██████ terrorists
recovered from the ██████ in ██████ and brought to a U.S. military base have basic due
process rights, then a stateless minor who is the orphan of ████████ parents, recovered
from the ██████ in ██████ and brought to a military installation, who is currently the legal
ward of U.S. citizens and a patient in the Military Health System, also has due process rights.

### c. Contrasted Treatment of Indian National

Baby L.'s case also stands in stark contrast to that of an Indian National with *no*
connections to the United States beyond working as a low level sub-contractor in ██████ *See*
*United States v. Naik*, No. 19-CR-373 (TSC), 2020 WL 534539, at *4 (D.D.C. Feb. 2, 2020). If

███████ a foreign national charged with sexual assault, must be provided due process rights while at ███████ (including the right to counsel) and can be extradited to the United States to stand trial for a sexual assault that allegedly occurred in ███████ on ███████ ███ then surely an innocent minor child under Baby L.'s unique circumstances must at a minimum receive meaningful due process rights. Baby L.'s due process rights must, at a minimum, include the right to have her best interests protected by an independent review of her best interests, and the vetting of anonymous "claimants" for ███████ ties and DNA vetting for proof of familial relation; or simply by allowing her duly appointed guardians, the Plaintiffs, to act on her behalf.

### d. Patient Rights

Defendant's actions also stands in stark contrast to the standard of care outlined by Department of Defense Instruction (DoDI) 6000.14, which outlines Baby L.'s patient rights as a patient in the Military Health System and as a ███████ (Doc. 1, Exhibit R). Specifically, Patients have the right to:

1) "…care and treatment in a **safe environment**.

2) "…care and treatment that is consistent with *available* resources and *generally accepted standards*, *including access to specialty care*…"

3) "**Informed consent**" on decision impacting her care.

4) "**Choice of Providers**," including the choice of a ███████ (

5) "…participate fully in all decisions related to their healthcare…"

6) "Transferred…only after he or she has received complete information and an explanation concerning *the needs for* and *alternatives* to such a transfer."

The rights listed above are intended by the Department of Defense to accomplish three major goals, including:

1) "To **strengthen patient confidence** by assuring the healthcare system **is fair and responsive** to patients' needs, provides patients with credible and effective mechanisms to **address their concerns**, and encourages patients **to take an active role** in improving and **assuring** their health."

2) "To **reaffirm the importance of a strong relationship** between patients and their healthcare professionals."

3) "To **reaffirm the critical role patients play in safeguarding their own health** by establishing both **rights and responsibilities** for all participants in improving health status."

In this case, with full knowledge of the Plaintiffs DOE 1 and DOE 2's status as legal guardians of this particularly vulnerable minor child, the Defendants have repeatedly attempted to discharge Baby L. from the military hospital (where she had been a patient now for 160+ days) without Plaintiff DOE 1's knowledge or consent, and contrary to DOE 1's explicit request to transfer her to a safe location for specialized pediatric care tailored to the child's medical needs. Furthermore, upon discharge from the military hospital, the Defendants intended to transfer Baby L. out of the exclusive custody of the United States that she had enjoyed since being recovered wounded from the battlefield on 6 November 2019, and into an objectively dangerous environment.

Specifically, this objectively dangerous situation included being transported to an unknown location in an ▮▮▮▮▮▮▮▮ in rural ▮▮▮▮▮▮ in winter, whereupon custody would be transferred to an anonymous, un-vetted person(s) who are of an unknown national origin, without even DNA testing them to confirm a biological relationship to the child. Furthermore, given the circumstances of Baby L.'s recovery, there is a high probability that the anonymous person(s) are



affiliated members of the ███████████████ which is known for training their own children to be ███████ i.e. child soldiers employed in terrorist activities. (Doc. 1, Exhibits ███████ ).

Given the prevalence of human trafficking, including child sex and labor trafficking, outlined in the Department of State's own 2019 ███████████████ and the Department of Labor's report on the ███████████████████ which specifically find that ████████████████████████████████████"— transferring a child of Baby L.'s age, condition, and likely origin to anonymous unvetted person(s) is extremely dangerous. (Doc. 1, Exhibit W).

In light of the fact that the U.S. government has open source and declassified intelligence sources indicating that Baby L.'s parents were ███████ foreign fighters affiliated with the ███████ ███████████ (██ who entered ████████ illegally from ████████ in family units to wage ███ against the United States, and the fact that the anonymous person(s) in this case refuses to identify themselves or submit to DNA testing, there is a high probability that the anonymous person is an ██████████ or affiliated with ████████ (Doc. 1, Exhibit P). ██████ fighters are known to use their children as human shields. When such children are wounded and taken into U.S. or allied nation custody, ███████ fighters invariably demand the immediate return of these children. Moreover, the current political environment in ██████████ is such that the ████████ is denying the existence of foreign fighters, such as ████████ terrorist groups like the █████████████████ Thus, the failure of any claimants to come forward and seek custody on their own, combined with the desire to remain anonymous indicates with near-certainty that Baby L.'s origin is from a foreign fighter ████████ group and that any claimants are extremely likely to be affiliated with the same.

Furthermore, the objective of the operation during which Baby L. was recovered was a ███████████████████ associated with the ███████████████████ leading a group of ███████████████ foreign fighters. The high probability that any living relative belongs to an ███ ████ terrorist cell makes it extremely dangerous to Baby L.'s health and safety to be turned over to these or other un-vetted individuals in rural ████████ since ███████████████ will continue to aggressively target these ███████ groups with ███████████████ for the foreseeable future.

Besides the inherently dangerous proposition of turning a child over to an active terrorist cell, Baby L. risks once again suffering death or serious bodily injury as a result of U.S. combat operations in the specific region of ████████ in question, which is in proximity to known facilitation routes to the ████████ Furthermore, these ███████ groups are known for barbaric treatment of women and girls, including honor killings, stoning, beating for real or imagined offenses, and other discrimination against them on the basis of their female sex. As a female orphaned infant with ████████████, and therefore of little worth in their hyper-patriarchal society, it increases the odds that the ███████ groups may see her only value as a "████████ and train her to become a child suicide bomber.

While the circumstances surrounding Baby L. are complex, the dangers to her safety, health, and welfare are not – she is simply being placed at significant risk in violation of her own best interests and her guardian's rights to protect her. The Defendants have consistently illustrated through their conduct that the best interests of Baby L. are not a factor in their decision-making process. Thus, requiring the informed written consent of Baby L.'s guardians ensures that Defendant's future conduct will not harm the safety, health, or welfare of Baby L.

**B. Likelihood of Irreparable Harm Without Grant of the Requested Relief**

Next, the Court must consider the likelihood that plaintiff will "suffer irreparable harm without the grant of the extraordinary relief." *The Real Truth About Obama v. FEC,* 575 F.3d 342, 345–47 (4th Cir.2009) (quoting *Winter,* 555 U.S. at 20), *vacated by* 130 S.Ct 2371 (2010), *reinstated in part by* 607 F.3d 356 (4th Cir.2010). In October, 2019, Plaintiff Doe 1 was present in the room when ████████████████, who approximately 24 hours prior had been directed by the Office of the Vice President to "make every effort" to get Baby L. to the U.S. for treatment, aggressively asked the ██████ representatives "how soon they could take the child," despite their protests that the ██████ orphanage system could not care for a child less than ████ years of age, or one with Baby L.'s medical needs.

In addition, Plaintiffs allege that, without notice or consent, Defendants attempted to fly the Child from ██████████ to ██████ on February 11, 2020 as outlined in the complaint, ████████████ failed to make any attempt to notify DOE 1 and DOE 2 of DoS' intent to discharge Baby L. from a military hospital, move the Child, and turn her over without any attempt at DNA-vetting the claimants or vetting for ██████ links.

This was another reversal of a previous ██████ child protection policy that treated the claimed existence of a living relative as a rumor until the purported relative presented himself for identification and a relationship was established by a DNA test. If a living relative were verified by DNA, ██████ policy was that the living relative be informed of the nature and extent of the child's injuries, the future cost of treating the injuries, and information that free medical care for the child in the United States would be extended.

This policy presumed that ██████ affiliated claimants would self-screen out of the process due to their desire to remain anonymous to the U.S. government, while recognizing the

moral obligation of the United States to make a child whole when that child had suffered as collateral damage in a U.S. combat operation.

Based upon the allegations of prior behavior in the verified complaint, as well as the complete lack of response to communications by Plaintiffs and their counsel to the Defendants inquiring as to their willingness to protect the Child, there is a great risk that ███████████ ███████ and those John Doe Defendants acting in concert with her will again attempt to move the Child without notice, and hand her over to unvetted third parties. Should this occur, the Child will disappear into rural ███████████ and thus the Plaintiffs will be irreparably harmed in the absence of the requested relief to maintain the status quo. *See Cocom v. Timofeev*, 2018 U.S. Dist. LEXIS 139735 (2018) at *10-11; *Culculoglu v. Culculoglu*, No. 2:13-CV-00446-GMN, 2013 WL 1413231, at *2 and *5 (D. Nev. Apr. 4, 2013) (holding that plaintiff would likely suffer irreparable harm without a TRO because defendant had previously concealed the location of plaintiff's children from plaintiff).

Today, on 26 February, 2020, Plaintiff DOEs received information that that ███████ ██/██████ again has arranged to allow Baby L. to be turned over to an anonymous person of unknown nationality through the ICRC without DNA testing, or any other form of vetting for terrorist affiliations, and again with no notice to Plaintiff DOEs or any discussion about their rights as legal custodians of Baby L. or the Best Interests of the Child. On information and belief, **the transfer through ICRC to the unknown claimant will occur after midnight tonight on February 26, EST, or ███████████████████████████** ████████████). Given ████████████████ and State/███████ continuous pattern and practice of attempting to remove Baby L. from U.S. custody without any notice to Plaintiffs, the risk of irreparable harm is actual and imminent, and is certain to continue unless immediately restrained.

*See Scotts Co. v. United Industries Corp.*, 315 F.3d 264, 283 (4th Cir. 2002) (explaining that the irreparable harm must be "actual and imminent").

### C. The Balance of Equities Tips in Favor of Protecting Baby L.

The Court must next consider whether the balance of equities tips in Plaintiffs' favor. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). There is a significant risk that Defendants will hand the Child over to third parties without notice before the petition is adjudicated. *See supra* Section III.B. Should this happen, the risk of harm to the child is great, and the ability for the Plaintiff's to meaningfully exercise their rights to protect Baby L. will be extinguished.

Plaintiff DOE 1 has consistently communicated to ▮▮▮▮▮▮ and Defendants his efforts to advocate for Baby L., including his legal custody over the Child, which was sought in order to provide her with a legal identity, medical treatment, and to otherwise act in her best interests. DOE 1 apprised DoD when he obtained legal custody over the Child and when he obtained a specialized Pediatrician for the Child.

Accordingly, a TRO will not impose a substantial hardship on Defendants, because it merely restrains them from acting against the Child's best interests by requiring Defendants to notify Plaintiffs and receive informed written consent prior to taking an action that impacts the health, safety, or welfare of Baby L. Thus, the TRO merely requires what is expected of federal agencies for guardians of minor children in the first place. Given that the risk of Defendants again attempting to turn the Child over to unvetted third party claimant[s] before resolution of this petition outweighs any such potential injury that Defendants, including DoS or ▮▮▮▮▮▮▮, may suffer, granting the TRO is appropriate. Under these facts, because a TRO is necessary to

preserve the status quo during the pendency of litigation, and because it does not alter the status quo, it should be granted. *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 n.8 (4th Cir. 2019) ( "the applicant's right to relief [is] indisputably clear" where a preliminary injunction allowing applicant to access land in order to build a pipeline would inevitable result in the same harm to landowner's property regardless whether granted before or after a determination was made regarding what constituted just compensation). Here, there is no harm to the Government actors, and Plaintiff's "right to relief [is] indisputably clear." *See The Real Truth About Obama v. FEC,* 575 F.3d 342, 345–47 (4th Cir.2009) (quoting *Winter,* 555 U.S. at 20), *vacated by* 130 S.Ct 2371 (2010), *reinstated in part by* 607 F.3d 356 (4th Cir.2010).

### D. Whether Issuing a TRO will Benefit the Public Interest

Preliminary relief would advance the public interest by upholding fundamental rights of legal custodians and their ward which are guaranteed by the Fifth and Fourteenth Amendment. *See Phelps-Roper v. Nixon,* 545 F.3d 685, 690 (8th Cir. 2008) ("[I]t is always in the public interest to protect constitutional rights."); *Rhodes v. Chapman,* 452 U.S. 337, 362 (1981) ("The public certainly has an interest in the judiciary intervening when prisoners raise allegations of constitutional violations."); *Elam Constr., Inc. v. Reg'l Transp. Dist.,* 129 F.3d 1343, 1347 (10th Cir. 1997) ("The public interest also favors plaintiffs' assertion of their First Amendment rights."); G & *V Lounge, Inc. v. Mich. Liquor Control Comm'n,* 23 F.3d 1071, 1079 (6th Cir. 1994) ("[I]t is always in the public interest to protect the violation of a party's constitutional rights."). All citizens of the United States, like Plaintiffs DOE 1 and DOE 2 have an interest in ensuring that the executive branch does not violate the constitutional right of citizens to make decisions in the best interests of their minor ward.

Rather than injuring the public interest, issuing a TRO under the circumstances protects the strong public interest in preventing the Child's removal or concealment before the final disposition of a petition involving her interest. There is also a strong public interest in protecting minor children from foreseeable harm, as the Best Interest of the Child standard under ███ adoption of the UCCJEA is intended to do. "Protection of every citizen's constitutional and statutory rights is fundamental to protecting the public interest." *Tribe v. Fleming*, No. CV 13-5020-JLV, 2017 WL 530452, at *4 (D.S.D. Feb. 9, 2017).

Furthermore, there is a public interest in respecting the custodial rights of ███ ███ that are being selectively ignored by federal agencies, and in protecting the health, safety, and welfare of orphan minors in U.S. custody, especially those who are ███ ███ with serious medical needs.

There is a strong public interest in preventing a legal ward's health, safety and welfare from being arbitrarily and capriciously endangered at the behest of DoS or DoD actors, and turned over to likely ███ ' confidence in the actions of their Government will be undermined if the Child in this instance, who is known and loved by ███ ███ is arbitrarily disposed of without an objective Best Interests of the Child analysis and thorough vetting of all claimants for DNA matches and association with terrorist groups. Therefore, the public interest will not be injured by issuing injunctive relief in this case.

### IV. Procedural Requirements for a TRO

Prior to granting a TRO, the Court must find that notice to the defendant is not required. The defendants have actual notice of Plaintiff's request for a TRO, as a copy of Plaintiffs' Complaint, Memo in Support of a TRO, and proposed TRO have been provided via email.

Pursuant to Federal Rule of Civil Procedure 65(b), to issue a TRO without notice, the Court must find that the specific facts in plaintiff's verified complaint "clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b). The facts set forth in the verified Complaint show that Plaintiffs are likely to suffer irreparable injury if the Court does not maintain the status quo until plaintiff's petition is adjudicated fully. *See supra* Section III.B. The same reasoning applies for why Plaintiff will suffer irreparable injury before defendant can be heard in opposition, as there is a risk that Defendant could, again, attempt to dispose of the Child without notice to DOE 1 and DOE 2. *Id.* For these same reasons, notice would defeat the purpose of the relief plaintiff seeks. *See Lawrence v. Lewis* 2015 WL 1299285, at \*4 (finding that notice was not required because of the risk that respondent would attempt to evade the court's order by removing subject child from the jurisdiction). In light of ▮▮▮▮▮▮'s prior actions in defiance of the Vice President's request to get Baby L. to the United States (and in fact directly oppositional response to the ▮▮▮▮ of "how soon can you take her?"); in light of Defendant's facilitation of a flight from ▮▮▮▮ to ▮▮▮▮ without notice to the Child's legal custodians, despite having notice of the Child's status as a ▮▮▮▮▮ and her status as DOE 1's legal ward, Defendant is likely to attempt yet another instant handover to unvetted third parties, evading this Court's jurisdiction.

Rule 65(b) also requires that "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b). Other courts that have considered the issue have found that notice is not required when plaintiff establishes a risk of immediate and irreparable injury, even if plaintiff's counsel does not appear to have certified in writing any efforts made to give notice. *See, e.g.*, *Lawrence*, 2015 WL 1299285, at \*4 (granting a TRO without notice without noting whether plaintiff's counsel certified in writing any

efforts made to give notice); *Mauvais v. Herisse*, No. CIV. A. 13-13032-GAO, 2013 WL 6383930, at *1 (D. Mass. Dec. 4, 2013) (stating that "[i]ssuance of an injunction without prior notice to defendant is necessary due to the possibility . . . that the children might be concealed or taken from this jurisdiction before the injunction can be served"); *Culculoglu*, 2013 WL 1413231, at *2 (holding that, "because of the risk that Respondent will flee this jurisdiction with the children, . . . it [is] necessary to grant this Motion for Temporary Restraining Order without notice to Respondent); *Wood v. Wood*, No. 13-CV-3046-TOR, 2013 WL 1907492, at *4 (E.D. Wash. May 8, 2013) (reasoning that it was appropriate for the TRO to be issued without notice to respondent for the same reasons that warranted issuing the TRO to begin with, including the dangers of petitioner being unable to locate the child in the future); *Mikovic v. Mikovic*, No. 3:07-CV-69732-TEM, 2007 WL 2225979, at *2 (M.D. Fla. Aug. 1, 2007) (finding that entry of a TRO without prior notice was appropriate because "[t]he likelihood that Respondent will flee this Court's jurisdiction with [the child] will increase dramatically when she is served with the Verified Petition seeking return of [the child]").

Here, Baby L. is scheduled to be turned over at ▮▮▮▮▮▮▮▮▮▮ and thereafter at any moment, and there is a greater than ▮▮▮▮▮ time difference between this jurisdiction and ▮▮▮▮▮ and the inherent difficulty of seeking judicial review on short notice due to that difference. In addition, Defendants have refused to communicate their posture toward the steps that will be taken to protect Baby L. from foreseeable harm. Thus, like the courts above, this Court should find that the risk that the Defendants may again attempt to dispose of the Child once they have notice that Plaintiff's verified complaint has been filed warrants issuing a TRO without notice.

Rule 65 also requires the Court to determine whether bond is required in this case. Fed. R. Civ. P. 65(c). *See Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013) ("[T]he district court retains the discretion to set the bond amount as it sees fit or waive the security requirement." (citations omitted) ) .The Court should find that bond in this case would be waived or nominal, as, pragmatically, the order simply requires Defendant to not remove the Child from US DoD custody until the Court has a hearing on the merits of plaintiff's petition. *Mikovic v. Mikovic*, 2007 WL 2225979, at *2 (involving custodial rights over children; waiving the bond requirement "as this is not a case suited to monetary bonds"); *Morgan v. Morgan*, 289 F. Supp. 2d 1067, 1070 (N.D. Iowa 2003) (stating that any bond in this type of case would be "nominal"). In its discretion, the Court should find that bond is not required in this case.

### VI. Conclusion and Proposed Order

Upon balancing each of the factors for determining whether to grant a TRO, and pursuant to Federal Rules of Civil Procedure 65(b) and (c), the Court finds that Plaintiffs DOE 1, DOE 2, and Baby L. have demonstrated that a TRO is warranted in this case. Plaintiff's petition for the issuance of an immediate order requiring the Plaintiff's informed written consent to take any action that would materially impact the health, safety, or welfare of Baby L. by Department of State actors, Department of Defense actors (or others agencies acting on their behalf) is hereby **GRANTED**.

Effective from the time of filing this action, Defendants are hereby **TEMPORARILY ENJOINED** as follows:

1. Defendants shall not take any action to remove the child from the jurisdiction of this Court.

2. Defendants shall secure the written permission of Plaintiffs prior to taking any action that materially impacts the health, safety, or welfare of minor child, Baby L.

3. This temporary restraining order shall expire within fourteen (14) days of this order, unless, prior to that time, the order is extended upon good cause shown, the parties consent to a longer period, or the hearing is continued upon good cause shown.

4. This temporary restraining order shall be binding on the parties to this action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of this order. *See* Fed. R. Civ. P. 65(d)(2).

In addition, the parties are **ORDERED** to appear for a preliminary injunction hearing on _____ **2020, at** _____ in Courtroom \_\_\_\_\_ of the United States Courthouse at Charlottesville, Virginia, at which date and time defendant shall show cause why they should not be enjoined to require the permission of Plaintiffs prior to taking any action that materially impacts the health, safety, or welfare of minor child, Baby L. The parties are advised that the Court "may advance the trial on the merits and consolidate it with the [preliminary injunction] hearing." Fed. R. Civ. P. 65(a)(2).

IT IS SO ORDERED.

_____
s/

UNITED STATES DISTRICT JUDGE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

Baby L. a minor, by and through her legal
guardians next friends, DOE 1, individually and as
next friend of Baby L., and DOE 2, individually
and as next friend of Baby L.

                 *Plaintiffs*,

          v.

Dr. MARK ESPER, in his official capacity as
Secretary for the United States Department of
Defense; MICHAEL POMPEO, in his official
capacity as Secretary for the United States
Department of State, DONNA WELTON, in her
official capacity as Assistant Chief of Mission, United
States Embassy Kabul (USEK), DOE
DEFENDANTS 1-20, in their official capacities,

                 *Defendants*.

Civil Action No. _____

## TEMPORARY RESTRAINING ORDER

Plaintiffs' Application for Temporary Restraining Order was heard this day before the

Court pursuant to Fed. R. Civ. P. 65. The Court considered the record, including the Motion, the

Verified Complaint of Plaintiffs and supporting exhibits, which serves as an Affidavit in Support

of the Motion and the Memorandum of Law in Support of the Motion. After due consideration,

the Court is of the opinion that unless a Temporary Restraining Order is issued to preserve the

status quo, Plaintiff Baby L. and DOE 1 and DOE 2 will suffer serious and irreparable injury for

which there is no adequate remedy at law.    Plaintiff is, therefore, entitled to a Temporary Restraining Order.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED this 26 day of February, 2020, effective from the time this case was filed with the Court, that Defendants, Dr. Mark Esper, Secretary of Defense, Michael Pompeo, Secretary of State, and Donna Welton, Assistant Chief of Mission, U.S. Embassy Kabul (USEK); and all other persons acting in concert with them, are hereby restrained from taking any action that impacts the health, safety, or welfare of Plaintiff Baby L. without the informed written consent of DOE 1 and DOE 2. This order specifically includes, but is not limited to, attempting to discharge Plaintiff Baby L. from the Military Health System (MHS) at the ███████████████████ (███ at ███████████████ (███) ███████ without the informed written consent of DOE 1 and DOE 2, or relinquishing custody of Baby L. to any party or parties outside of the U.S. Department of Defense, except for purposes of immediate ambulatory evacuation (medevac) to the United States.

This Temporary Restraining Order will expire by its terms at the expiration of fourteen (14) days from the date and time of entry, unless within the time so fixed, it is extended for good cause shown, for a period not to exceed an additional ten (10) days, or unless Defendants consent that it may be extended for a longer period.

IT IS FURTHER ORDERED that a hearing on Plaintiffs' Motion for Preliminary Injunction shall be held on _____, at _____ o'clock ___M.


_____
United States District Court Judge

Temporary Restraining Order - Page  2